BEARRY, et al. *v.* STRINGFELLOW, et al.

No. 42539        February 11, 1963        149 So. 2d 500

*W. S. Murphy,* Lucedale, for appellants.

*Cumbest & Cumbest,* Pascagoula, for appellees.

Lee, P. J.

Mrs. Betty Stringfellow, for herself and as mother and next friend of Melvin Richard Stringfellow and Phillip Wayne Stringfellow, minors, being the widow and children, respectively, of Melvin Ira Stringfellow, deceased, filed this suit against W. D. Bearry and James H. Smith to recover damages for the wrongful death of their husband and father.

It was charged in the declaration that W. D. Bearry, on May 26, 1961, was Sheriff of George County, Mississippi, and that James H. Smith was his duly appointed deputy, acting as Bearry's agent and employee within the course and scope of his agency and position as a member of the sheriff's office; that, on said date, Smith, in a highly wrongful and grossly negligent manner, shot and killed the decedent Stringfellow, and that such negligent and wrongful death was the act of both

126

defendants. Damages, both actual and punitive, were demanded.

The defendants, in their answer, denied all of the material allegations of the declaration, and set up affirmative matter to the effect that the deceased, at the time he received his mortal wounds, had been arrested while bringing supplies to an illegal whiskey still and was trying to escape; that he was a fleeing felon at the time; that his death was due to his own negligence; and that the death of the decedent was unforseen and unavoidable and not due to the negligence of either of the defendants.

The issue was submitted to a jury, which found a verdict for the plaintiffs in the sum of $50,000. Upon defendants' motion for a new trial, the same was sustained unless the plaintiffs should, within ten days, enter a remittitur for $25,000. This order of the court was promptly accepted by the plaintiffs. The appeal is by the defendants from the judgment entered.

There were only two witnesses to this killing, E. W. Thompkins and James H. Smith. Thompkins, thirty-four years of age, an honorably discharged combat naval veteran with overseas duty, who had never been convicted of any crime or even arrested therefor, was called as a witness for the plaintiffs. He testified that he lived slightly more than a quarter of a mile from the whiskey still in question; but it was not his still. It was on the land of the International Paper Company. He said that he was going to the still that morning in search of his hogs and that he had engaged Melvin Stringfellow to help him. Ira Ford Stringfellow, Melvin Stringfellow and the witness, in that order, and about three feet apart, were walking along a path. Ira had four or five jugs in his hands. He said that he and Melvin had nothing. They were about to cross a small creek. Ira had just put one foot on the footlog when he suddenly turned and started to run. Just as Ira

passed, a gun was fired, and the witness and Melvin were both shot down. He and Melvin had also turned, but they did not run a step. James H. Smith, the deputy who shot them, said nothing to them before the shooting. He did not advise them that they were being arrested. After the shooting, Melvin was lying on his back, and the witness, who was hit with nine number four shot, was on his elbows. As Smith started to cross the little creek, he reloaded his gun. When he got to where the witness and Melvin were lying, he said "Lay there, G.. d... you." Then he told them to get up and Melvin told him that he could not get up and Smith said "G.. d... it, I said get up", and Melvin again said "I can't". The witness said that he got up and Smith told Melvin again to get up, and when Melvin replied that he could not move, Smith reached down, got him in the collar, pulled him up, and said "Now, by G.., go to the hills." When Melvin said "I can't", Smith turned his shirt loose, and he fell back to the ground apparently dead.

James H. Smith, called as an adverse witness for the purpose of cross-examination, admitted that he was a duly appointed and acting deputy sheriff, working under Sheriff W. D. Bearry; that he was being paid to act as a deputy by the sheriff, and that the sheriff knew that he was at the still; and that he was acting with the knowledge and consent of the sheriff. He and another deputy had discovered the still on Monday. He spent four nights keeping a watch. The shooting occurred about 7:30 or 8 o'clock the following Friday morning, May 26, 1961. He went to the still to see if a "run" had been made that night. As he was looking over the ground, he heard jugs "tinkling" and decided that it was too late to call for help and that he would have to handle the problem by himself. He had a double barrel 12-gauge shotgun, loaded with 00 buckshot and No. 4 shot. He was standing between two vats when

he heard the men approaching. When the one in front saw him, Smith testified that he said "You are under arrest. This is the deputy sheriff, you are under arrest." Ira Stringfellow began to run. The witness pushed the safety off and the gun went off. He did not know why as he did not have his finger on the trigger. He admitted that he stated in a previous hearing that the gun was defective, but he then qualified that statement by saying that he did not find this out until three or four days after the accident. He said that he saw Ira Stringfellow, but he could not see the others at the time the gun went off because of the dense growth of bushes. He said that Ira threw down his jugs, and he admitted that he did not see but one "bunch of jugs", and that, if he had wanted to shoot somebody, he would have shot Ira. It was thirty to forty feet from where he was standing to the place where Melvin fell. He testified that he did not shoot because the persons were fleeing felons, but that he shot because the gun went off and he did not know why it did that. He admitted that at first he told the injured men to get up, and that he might have said a curse word or two, but he denied that he cursed them. He said that Melvin was struck in the left side of his back and shoulder and died before he could get him to the hospital. (His evidence was devoid of any claim that he told Stringfellow or Thompkins at the time that the shot was fired accidently.)

With the evidence by the widow, showing the decedent's age at nearly twenty-two, that he was earning in excess of $2 an hour at Ingalls, and love and affection for her and the living child — the second not then being born — the plaintiffs rested.

On his direct examination for the defendants, Smith said that he had never fired this gun before that day. He obtained the shells from Sammy Havard, another deputy. However, one day while he was watching the still, he struck a blow with it in an effort to kill a snake

but missed. The gun did not go off at the time. He did not say anything about any subsequent examination to determine whether the gun was damaged in any way from that blow. He said that, when Ira was on the footlog, he was in plain view. The witness could not see the others but heard voices. As he raised up and said "This is the deputy sheriff and you are under arrest," Ira or somebody hollered something and broke to run. It was then that he pushed the safety off and the gun fired. He was familiar with guns and firearms, but there was nothing about this gun to lead· him to believe that there was anything wrong with it. He did not know that both barrels had gone off until he started to unload his gun and give it to Thompkins as he was trying to get Melvin out of the swamp. It was then that he found that both shells had been fired. He did say that his thumb was "busted" from the explosion. He also said that there were jugs at the footlog and jugs just north of the two wounded men, and some of them were lying close to Thompkins. On cross-examination, he said that he did not point the gun, but that it was in that direction at the time. He took the safety off because he did not know what to expect and he could not see the other men at the time he pushed the safety off, and thought maybe they might have guns. He said that he thought Melvin was bringing supplies to the still and, to his knowledge he was bringing jugs, but he did not see jugs in the hands of either. He denied that he reloaded the gun after he shot the men.

W. D. Bearry, the Sheriff, testified that he knew that Smith and Havard had this still under observation, they had reported it to him from time to time, and he let Smith have the gun in question, which he had owned about twenty years. As far as he knew, it was in perfect condition. However, on cross-examination, he said that, normally it would be safe; but after an examination he did not then think so. Counsel had the witness to

demonstrate the firing of the gun, without ammunition, in the presence of the jury.

(Hn 1) The appellants have assigned a number of errors, but they all turn on the question as to whether (1) they were entitled to a peremptory instruction, (2) whether the verdict is contrary to the overwhelming weight of the evidence, and (3) whether the verdict is excessive.

The evidence of the only two eye-witnesses is in sharp dispute: Smith said he called out to the parties in words, showing that he was an officer and trying to put Ira and the others under arrest. Thompkins' evidence amounted to a denial of that and was that Smith said nothing. Smith said that Melvin and Thompkins were bringing jugs to the still. But Thompkins said that he and Melvin had nothing. Smith said that he pushed the safety off, not to shoot fleeing felons, but in fear that those, whom he could not see, might have guns, and that the gun went off accidently. But Thompkins said that, as Smith came near them after the shooting, he cursed them and told them to lie there; and that, before he came over the creek, he reloaded his gun, and proceeded to curse them as they lay helpless on the ground. Significantly Smith made no claim that, at that time, he made any explanation or expressed any regret on account of an accidental firing of the gun. On the contrary, if Thompkins' version was true, the firing of the gun without notice and the language of Smith thereafter would indicate gross negligence and wilfulness and wantonness. Besides, there was no claim of any kind of inspection after the use of the gun as a cudgel in an attempt to kill a snake.

Hinton v. Sims, 171 Miss. 741, 158 So. 141, was a suit by the widow and children of Hinton to recover for the death of their husband and father, wrongfully caused by Sims while acting as deputy sheriff. The sheriff and his two deputies, Sims and another, had found a

still and had been watching it for the purpose of apprehending the operators. The two deputies went to the still early and discovered that one barrel of mash had been "run". Armed with double-barreled shotguns, loaded with buckshot, they hid themselves about eleven steps from the still. About eleven o'clock, Hinton was approaching along a path and Sims awakened Myers who had gone to sleep. When Hinton got within about eleven steps of them and about the same distance from the still, Sims saw that Hinton had discovered and recognized him. Sims told Hinton two or three times to put up his hands. Instead of obeying, he dropped a little sack to the ground and put his right hand to his right hip pocket. Sims repeated the command, "Don't do that, put up your hands", and then shot. Neither informed Hinton that there was a criminal charge against him for which they were seeking to arrest him. Hinton was never conscious after being shot. In the sack, there was an empty fruit jar. In the hip pocket, there was a quart bottle with the smell of whisky and about a spoonful of whisky. He also had a fishing tackle, but no weapon of any kind. Hinton owned neither the still nor the land on which it was located, but lived about seven miles away. The possession and operation of a still, of course, constituted a felony. The officers were engaged in an effort to apprehend the felon. They had no warrant for the arrest of anyone. The question was whether or not the killing was unnecessary and wrongful.

The opinion quoted Sec. 1227, Code of 1930, now Sec. 2470, Code of 1942, Rec., as to arrests. It said that the officers had no right to arrest Hinton without a warrant unless they had reasonable ground to suspect and believe either that the still was his, or that he was operating it; and in making the arrest, they were required to inform him of the object and cause of the arrest. However, the court passed that question because it was of the opinion that Sims' attempt to arrest was illegal

because the officers had told him several times to put up his hands instead of telling him to consider himself under arrest. The opinion held that the killing of Hinton was a "negligent, unnecessary, and wrongful killing." See also Maryland Casualty Company v. Eaves, 188 Miss. 872, 196 So. 513.

In the present case, while Smith testified that he put the parties under arrest, Thompkins testified that he did nothing of the kind. Since the jury accepted the plaintiffs' theory, Hinton v. Sims, supra, is directly in point.

Consequently, the court was not in error in refusing the requested peremptory instruction. The evidence was ample to sustain the verdict, and it was not against the great weight of the evidence. **(Hn 2)** According to the evidence for the plaintiffs, there was justification for the award of punitive damages in addition to actual damages. The court having required a remittitur of $25,000 of the $50,000 verdict, this Court cannot say that $25,000 is excessive.

It follows that the judgment must be, and it is, affirmed.

Affirmed.

*Kyle, Arrington, Ethridge and Rodgers, JJ., concur.*